IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

MELISSA SUZANNE SMITH,

      Plaintiff,

v.                                        CASE NO. 1:09-cv-00114-MP-AK

MICHAEL J. ASTRUE,

      Defendant.

_____/

## O R D E R

This case is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act

(Act) for review of a final determination of the Commissioner of Social Security (Commissioner)

denying Plaintiff's application for disability insurance benefits (DIB) filed under Title II of the

Act. Upon review of the record, the Court concludes that the findings of fact and determinations

of the Commissioner are supported by substantial evidence, and the decision of the

Commissioner therefore must be affirmed.

## A.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB on October 5, 2005, alleging a disability onset date

of August 14, 2003, because of back pain, carpal tunnel syndrome (CTS), fibromyalgia, and high

blood pressure. Plaintiff petitioned for a hearing before an administrative law judge (ALJ), who

conducted a hearing on December 3, 2007, and entered an unfavorable decision on February 6,

2008. (R. 28). The Appeals Council denied Plaintiff's request for review, thus making the

decision of the ALJ the final decision of the Commissioner. (R. 7). This action followed.

B.      <u>FINDINGS OF THE ALJ</u>

The ALJ found that Plaintiff had the following severe impairments: hypertension, well controlled; hypercholesterolemia; eustachian tube dysfunction; chronic pain; chronic abdominal and gastrointestinal problems; and obesity, but that these impairments, singly or in combination, did not meet the listing requirements.  While the ALJ found that Plaintiff had medically determinable impairments that could reasonably be expected to produce the alleged symptoms, he did not find the intensity, persistence, and limiting effects reported by Plaintiff to be entirely credible.  Specifically, in assessing Plaintiff's credibility, the ALJ referred to Plaintiff's description of her activities and lifestyle, the medical treatment required, her assertions and demeanor while testifying at the hearing, and the reports of the examining practitioners.

The ALJ found "no medical evidence to show the presence of a medically determinable mental impairment."  (R. 24).  Plaintiff reported that she works part-time as a preschool teacher, drives for short distances, and attends to her own personal care.  The ALJ noted that Plaintiff has never received psychiatric or psychological care, nor has she experienced medically documented difficulties with activities of daily living, social functioning, concentration, or persistence.

The ALJ also determined that Plaintiff may experience some limitations from her back, neck, and shoulder pain, but "the evidence as a whole does not substantiate any cause for such debilitating pain . . . which would preclude all work activity."  (R. 25).  Dr. Chodosh, a consultative examining physician, determined that Plaintiff is "generally independent in activities of daily living," and her dexterity is reasonable.  (R. 26).  Additionally, Dr. Chodosh reported that Plaintiff "is able to lift moderate weight occasionally, unable to carry any significant weight, handle objects of moderate weight and size occasionally; is able to stand/walk

to a moderate extent; is able to sit normally; and is able to stoop occasionally." (R. 26). The ALJ also accorded weight to the state agency physicians who evaluated Plaintiff at the initial and reconsideration levels. (R. 26). The ALJ accorded little weight to the opinion of Dr. West, a treating chiropractor, because the ALJ determined that Dr. West's opinion was inconsistent with the medical evidence of record. Dr. West concluded that Plaintiff "only could lift 10 pounds, could sit or stand/walk for less than 3 hours each in an 8-hour workday, and should avoid operating motor vehicles as well as that [Plaintiff] would be absent from work for three days per month as a result of the impairments or treatment." (R. 25).

The ALJ found that Plaintiff was not capable of performing her past relevant work as a school bus driver and a preschool teacher. The ALJ determined, however, that Plaintiff was capable of obtaining and maintaining employment other than her past relevant work. The ALJ noted that transferability of job skills was not material to the disability determination because the Medical-Vocational Guidelines did not support a finding that Plaintiff is disabled. The ALJ relied on the testimony of a vocational expert, who stated that, based on Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff could perform work as a clerical switchboard operator, a call out operator, or an appointment clerk. The vocational expert also testified that there are significant numbers of jobs for each position in the national economy. Thus, based on the Medical-Vocational Guidelines and vocational expert testimony, the ALJ found that Plaintiff was not disabled during the time period at issue.

## C.   <u>ISSUES PRESENTED</u>

Plaintiff argues that the ALJ erred in failing to consider all of Plaintiff's impairments in combination and the impact of her impairments on her ability to work. Specifically, Plaintiff

contends that the ALJ failed to find the following impairments severe: (1) bilateral CTS in addition to de Quervain's tenosynovitis; (2) fibromyalgia; and (3) depression. Plaintiff argues that this error limits this Court's ability to review the ALJ's decision to determine: (1) if the ALJ properly determined which impairments were severe at step two and (2) if the ALJ properly considered all of Plaintiff's impairments in combination. Plaintiff further argues that the ALJ failed to comply with SSR 96-6P by not treating the opinion of Dr. Long, a state agency non-examining consultant, as the expert opinion of a non-examining source. Plaintiff contends that the ALJ failed to provide his reasons for rejecting the opinion of the state agency consultant.

The government responds that the ALJ properly considered the combined effect of all of Plaintiff's impairments, including properly analyzing the medical evidence and finding that only some of Plaintiff's impairments were severe in combination. The government also argues that the ALJ properly determined that Plaintiff's statements regarding the severity of her symptoms were not entirely credible. The government contends that the ALJ did not disregard the opinion of Dr. Long, rather the ALJ considered the opinion and accorded weight to it. Finally, the government responds that substantial evidence supports the ALJ's determination that Plaintiff could perform other work in the national economy.

The issue thus presented is whether the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and decided by proper legal standards.

## D.     <u>STANDARD OF REVIEW</u>

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court. The Commissioner's decision must be affirmed if it is supported by substantial evidence and the

correct legal standards have been applied.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir.

1997).  Findings of fact by the Commissioner which are supported by substantial evidence are

conclusive. 42 U.S.C. § 405(g).  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).

"Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  Foote v. Chater, 67 F.3d 1553, 1560 (11th

Cir. 1995) (citation omitted) (per curiam).  It is more than a scintilla, but less than a

preponderance.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations

omitted).  The court may not reweigh the evidence or substitute its judgment for that of the

Commissioner.  Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996).  It must determine only if

substantial evidence supports the findings of the Commissioner.  See Bridges v. Bowen, 815

F.2d 622, 624 (11th Cir. 1987) (per curiam).  Even if substantial evidence exists which is

contrary to the Commissioner's findings, where there is substantially supportive evidence of the

Commissioner's findings, the court cannot overturn them.  Barron v. Sullivan, 924 F.2d 227, 230

(11th Cir. 1991).  Unlike the deferential review accorded to the Commissioner's findings of fact,

his conclusions of law are not presumed valid. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th

Cir. 1990) (citations omitted).  The Commissioner's failure to apply correct legal standards or to

provide the reviewing court with an adequate basis for it to determine whether proper legal

principles have been observed requires reversal.  Id. (citations omitted).

    A disability is defined as an "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or

mental impairment must be so severe that claimant is not only unable to do his previous work,

"but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps:

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairment?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation unnecessary.

Plaintiff bears the burden of establishing a severe impairment that keeps him from performing

his past work.  If Plaintiff establishes that his impairment keeps him from his past work, the

burden shifts to the Commissioner at step five to show the existence of other jobs in the national

economy which, given Plaintiff's impairments, Plaintiff can perform.  Chester v. Bowen, 792

F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If

the Commissioner carries this burden, Plaintiff must prove that he cannot perform the work

suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).  It is

within the district court's discretion to affirm, modify, or reverse a Commissioner's final decision

with or without remand. 42 U.S.C. § 405(g); Myers v. Sullivan, 916 F.2d 659, 676 (11th Cir.

1990).

## E.      SUMMARY OF CLAIMANT'S RELEVANT MEDICAL HISTORY

Because the ALJ's decision is dated February 6, 2008, the relevant medical records concern her condition prior to that time and after the onset date of August 14, 2003.

On August 28, 2003, Dr. Powell treated Plaintiff for follow-up complaints of "increasing pain in her hands with radiation down into her palms and up into her forearms," small finger numbness and tingling, and pain on her left side. (R. 193). He gave Plaintiff a cortisone injection. (R. 193). On September 18, 2003, Plaintiff reported that the cortisone injection had "helped significantly," but she had a recurrent onset of pain after grabbing a truck door. (R. 194). Dr. Powell gave Plaintiff a cortisone injection on her right side. (R. 194). Treatment notes from October 30, 2003 indicate that Plaintiff had CTS and some difficulty with her shoulder. (R. 195). Dr. Powell concurred with a permanent impairment rating provided by Dr. Leber for Plaintiff's CTS and shoulder, and he noted that Plaintiff's weight loss program could "resolve her [CTS]." (R. 195). Plaintiff returned to Dr. Powell's office on January 22, 2004 for complaints of a "sudden increase in pain in her hand." (R. 196). On February 26, 2004, Dr. Powell diagnosed Plaintiff with de Quervain's tenosynovitis, and he gave her a cortisone injection. (R. 198). Treatment notes from June 14, 2004 indicate Dr. Powell's concerns about proceeding with carpal tunnel surgery. (R. 199). Dr. Powell reported that Plaintiff had "never addressed her weight problem . . . and it may make the surgical outcome a little in doubt." (R. 199).

Dr. Leber followed-up with Plaintiff October 16, 2003, regarding pain from her work injury on July 14, 2001. (R. 267). The impression was left median neuropathy and left shoulder tendonopathy. (R. 267). Dr. Leber limited Plaintiff from driving more than two hours at a time and more than four hours in a day. (R. 267). He also noted that Plaintiff should avoid repetitive

hand motion and lifting of more than thirty pounds. (R. 267). On January 8, 2004, Plaintiff reported that her shoulder "'locked up' for a couple of days" from muscle tightness. (R. 266). Dr. Leber encouraged Plaintiff to lose weight, noting that it would help with her pain. (R. 266). On referral from Dr. Powell, Dr. Leber performed an electrodiagnostic evaluation of Plaintiff on February 20, 2004. (R. 262). Dr. Powell reported that "[n]o abnormalities were identified in distal latency, amplitude or condition velocity." (R. 262). On March 18, 2004, Dr. Powell treated Plaintiff for left shoulder pain with left hand dysfunction related to her work injury. (R. 260). Plaintiff reported that her shoulder was sore and she had pain in her left thumb, but that her wrist was ninety-eight percent better and she was able to garden with a friend. (R. 260). On July 1, 2004, Plaintiff informed Dr. Leber that she would no longer seek treatment from Dr. Powell. (R. 258). Dr. Leber noted that Plaintiff's upper left extremity was intact, and flexion and extension of the left shoulder did not cause pain for Plaintiff. (R. 258). During a follow-up visit on November 11, 2004, Plaintiff reported that she received "significant relief from her left shoulder pain with the Flexeril." (R. 256). Treatment notes indicate that Plaintiff had only "localized pain in the left shoulder girdle muscles." (R. 256).

Dr. Wright began treating Plaintiff on August 7, 2003 for complaints of left shoulder and bilateral wrist pain. (R. 280, 282). He diagnosed Plaintiff with left shoulder myofascial pain, and he recommended physical therapy, deep tissue massage, and anti-inflammatory medication. (R. 282). Dr. Wright restricted Plaintiff to lifting no more than fifteen to twenty pounds, and he noted that she should avoid vibratory tools and excessive typing. (R. 283). He noted that Plaintiff "may have difficulty driving a bus," and he recommended rest and bracing for her wrist pain. (R. 283). On May 10, 2004, Plaintiff reported continued problems with her

left wrist, myofascial pain, and upper extremity pain. (R. 278). The impression was CTS and de Quervain's tenosynovitis. (R. 278). Dr. Wright recommended carpal tunnel release surgery, and he again restricted Plaintiff to lifting no more than fifteen to twenty pounds, limited typing, and no vibratory tools. (R. 278-279). After further evaluation on August 9, 2004, Dr. Wright recommended that Plaintiff undergo first dorsal compartment release and a carpal tunnel release. (R. 277). Surgery was performed on August 25, 2004. (R. 274). In postoperative notes dated September 13, 2004, Dr. Wright noted that Plaintiff should not use her left hand. (R. 276). On November 1, 2004, Dr. Wright referred Plaintiff to hand therapy. (R. 275). Two months later, Plaintiff reported that "the numbness and paresthesias [had] resolved, and her sensation [had] improved." (R. 274). Dr. Wright scheduled an MRI, and he increased her lifting limitation to fifteen pounds on the left side. (R. 274). The MRI revealed a dorsal ganglion cyst, but this did not impact Plaintiff's range of motion. (R. 269). Dr. Wright limited Plaintiff to lifting fifteen to twenty pounds, and he noted that she likely could not drive a school bus. (R. 269).

On January 17, 2005, Plaintiff was treated at First Care of Gainesville for complaints of "chest congestion with increasing productive cough causing stress incontinence." (R. 389). Dr. Newcomer diagnosed Plaintiff with upper respiratory infection, urinary stress incontinence, diffuse muscle pain, and hypertension. (R. 389). During a follow-up visit on June 1, 2005, Plaintiff reported bilateral ear pain, headaches, and occasional black floaters in her vision. (R. 388). She further reported that she was being treated by a chiropractor for fibromyalgia. (R. 388). Dr. Wilson diagnosed Plaintiff with hypertension, chest pain, otitis media, otitis externa, allergies, obesity, and fibromyalgia. (R. 387). On June 15, 2005, Plaintiff reported recurrent right ear pain. (R. 386). Dr. Newcomer diagnosed Plaintiff with recurrent right otitis media and

hypertension. (R. 386). Two months later, Plaintiff reported continued bilateral ear pain and pressure which radiated to her neck. (R. 384). The impression was "[h]ypertension well-controlled with Altrace," hypercholesterolemia, and eustachian tube dysfunction. (R. 384). Dr. Newcomer referred Plaintiff to an ear, nose, and throat specialist for ear pain evaluation. (R. 384). On October 20, 2005, Plaintiff complained of diarrhea, nausea, fatigue, abdominal pain from cramping, fever, and chills. (R. 382). Dr. Wilson gave Plaintiff a Phenergan shot, and he recommended testing to identify the source of her symptoms. (R. 383).

Dr. Staud, a rheumatologist, treated Plaintiff for complaints of neck pain and low back pain, fatigue, insomnia, and mild cognitive abnormalities on November 7, 2005. (R. 452). Plaintiff was diagnosed with fibromyalgia, low back pain, osteoarthritis, obesity, scoliosis, depression, hypertension, and a migraine. (R. 452). Dr. Staud recommended weight reduction, and he rescheduled a sleep study. (R. 452).

In a Physical Residual Functional Capacity Assessment completed on December 9, 2005, Dr. Jones noted that Plaintiff's primary diagnosis was back pain. (R. 391). Dr. Jones reported that Plaintiff had the following exertional limitations: occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, and limited pushing or pulling in her upper extremities. (R. 391-398). Dr. Jones further reported that Plaintiff had postural limitations of occasional climbing, balancing, stooping, kneeling, crouching, and crawling (R. 393). Dr. Jones also noted that Plaintiff had limited reaching ability, and she should avoid concentrated exposure to hazards. (R. 394-395).

Dr. Lloyd treated Plaintiff for diffuse muscle and joint pain on April 11, 2006. (R. 401).

He prescribed Zoloft for fibromyalgia, and he recommended that Plaintiff continue massage therapy. (R. 402). A month later, Plaintiff noted that Zoloft did not alleviate her stress level. (R. 399). Dr. Lloyd prescribed Lexapro. (R. 400). On June 22, 2007, Plaintiff sought treatment for "terrible pain." (R. 458). Dr. Lloyd diagnosed a flaring of Plaintiff's fibromyalgia, and he prescribed Wellbutrin. (R. 459). During a follow-up visit, Plaintiff reported that she chose not to take Wellbutrin. (R. 456). On September 24, 2007, Dr. Lloyd noted that Plaintiff was experiencing myofascial pain and that she was "on Wellbutrin." (R. 454).

On September 5, 2006, Dr. Chodosh, a consultative physician, examined Plaintiff for complaints of back pain, CTS, fibromyalgia, and high blood pressure. (R. 403). Plaintiff reported pain in her back, neck, arms, shoulders, legs, knees, and feet; muscle spasms; headaches; loss of strength in her upper body; and "a recent diagnosis of painful arthritis in both knees." (R. 403). Plaintiff related that she experienced pain from dusting and vacuuming, and she avoided heavy lifting. (R. 403). Dr. Chodosh reported that Plaintiff was "independent in activities of daily living," but she could not walk for more than twenty minutes, stand for more than thirty minutes, or sit for more than thirty minutes. (R. 403). Plaintiff had reasonable hand dexterity, and her vision, hearing, and speech were normal. (R. 403). Physical examination revealed that Plaintiff was morbidly obese, but otherwise she appeared healthy. (R. 404). Dr. Chodosh noted that Plaintiff was "fully oriented, ha[d] normal speech pattern, appropriate thought content, and normal talkative affect." (R. 404). Neurological tests revealed that Plaintiff had grossly normal motor function in all four extremities, normal manual dexterity, good coordination, and normal sensation. (R. 405). Plaintiff was diagnosed with "[c]hronic pain of uncertain etiology, without physical signs of impairment," "[c]hronic abdominal and

gastrointestinal complaints," and morbid obesity. (R. 406). Dr. Chodosh noted that he was not able to "make an adequate assessment of the knee joints," and he recommended radiographs. (R. 406). Dr. Chodosh opined that Plaintiff was able to "see, hear, and speak normally," and she could "handle objects of moderate weight and size occasionally." (R. 406). Further, Dr. Chodosh determined that Plaintiff could sit normally, stoop occasionally, and lift moderate weight occasionally. (R. 406). He opined that Plaintiff could "stand and walk only to a moderate extent," but she could not squat, kneel, or carry significant weight. (R. 406). Dr. Chodosh noted that "assessment activity could not be completed because claimant complained of pain, or requested that it be stopped." (R. 406).

In a Physical Residual Functional Capacity Assessment form completed on September 19, 2006, Dr. Long noted that Plaintiff's primary diagnosis was fibromyalgia. (R. 413). Dr. Long reported that Plaintiff had the following exertional limitations: occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday. (R. 413-420). Dr. Long noted that Plaintiff had postural limitations of occasional climbing ramps or stairs, balancing, stooping, kneeling, crouching; and never crawling or climbing ladders, ropes or scaffolds. (R. 415). Dr. Long further reported that Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards. (R. 417).

Dr. Cuesta, a podiatrist, treated Plaintiff on October 20, 2006 for "right foot pain along the [fifth] metatarsal base." (R. 422). She diagnosed Plaintiff with a stress fracture, and noted that Plaintiff had an "[i]nappropriate use of shoes." (R. 422). One month later, Plaintiff had "residual pain to the dorsum of the foot," but she no longer had pain on the bottom of the foot.

(R. 422).  On October 1, 2007, Plaintiff reported "significant pain and functional disability to the left foot."  (R. 463).  Radiographs revealed "a possible os peroneum at the base of the fifth metatarsal plantarly."  (R. 463).

In a Physical Capacity Evaluation form dated October 10, 2007, Dr. West, a treating chiropractor, diagnosed Plaintiff with myalgia, sacral dysfunction, thoracic dysfunction, and cervical dysfunction.  (R. 434).  He reported that Plaintiff had the following limitations: never operating motor vehicles or "working with or around hazardous machinery"; rarely performing pushing/pulling movements, climbing and balancing, and reaching; occasionally performing gross manipulation and bending or stooping movements; and frequently performing fine manipulation.  (R. 434).  Dr. West further reported that Plaintiff was limited to lifting ten pounds occasionally and five pounds frequently.  (R 434).

## F.    SUMMARY OF THE ADMINISTRATIVE HEARING

Plaintiff was 42 years old at the time of the hearing.  (R. 518).  She resides with her husband, who receives social security disability benefits due to his kidney failure.  (R. 515). Plaintiff completed high school and some college courses, but she does not have a post-secondary degree.  (R. 517).  She has past relevant work as a preschool teacher and a school bus driver.  (R. 517).  Plaintiff testified that she has CTS in both hands and a left shoulder injury from her position as a school bus driver.  (R. 518).  Dr. Leber restricted Plaintiff from driving (R. 519), and Plaintiff was told that there was not a school bus driver position for her due to her injuries.  (R. 518).  Plaintiff filed a worker's compensation claim, and it was settled for approximately $32,000.  (R. 519-520).  Plaintiff testified that fibromyalgia was her most disabling condition at the time of the hearing.  (R. 520).  She stated that the pain is "to the

extreme now where [she] rel[ies] on a lot of medicine." (R. 521).

At the time of the hearing, Plaintiff worked part-time as a preschool teacher for the Star Christian Academy. (R. 521). She teaches the children, but the "heavy lifting" is handled by the two other teachers in the classroom. (R. 521). Plaintiff reported that she works five hours a day, and she is able to rest during two and a half of those hours because the children are napping. (R. 521-522). She stated that these accommodations are not made in other classrooms. (R. 522). Plaintiff was hired by Ms. Stides, whom she had known for twenty years. (R. 522-523). The school is privately owned by Ms. Stides, and it operates kindergarten through fourth grade classes. (R. 523). Plaintiff reported that she has difficulty getting up in the morning, and she is often late to work. (R. 523). Plaintiff's duties involve standing or sitting in front of the class and teaching. (R. 523-524). Plaintiff is paid eight dollars an hour. (R. 541-542).

Plaintiff testified that she stopped taking Wellbutrin for her depression because it was "making [her] worse." (R. 524). She has been under the care of Dr. Lloyd for less than two years. (R. 525). Dr. Lloyd has prescribed several anitdepressant medicines, but they have not helped Plaintiff. (R. 525). Dr. Stroud diagnosed Plaintiff with fibromyalgia "about three years" prior to the hearing. (R. 525). Plaintiff was taking Nexium for acid reflux, Darvocet for pain related to fibromyalgia, Nasonex for allergies and high blood pressure, and Tazadan for muscle relaxation and as a sleep aid. (R. 525-526). As a result of the fibromyalgia, Plaintiff "hurt[s] all over," and she experiences constant pain. (R. 526). She has difficulty sleeping due to the pressure, and she often sleeps in an upright position in a recliner. (R. 527).

Plaintiff was involved in a motor vehicle accident in June 2002. (R. 527-528). Plaintiff was driving her private vehicle, and her car was hit from the back by a vehicle moving at sixty

miles per hour. (R. 528). Her vehicle was totaled, and she filed a claim with State Farm Insurance. (R. 529). Plaintiff reported that the claim with State Farm Insurance was settled. (R. 529). She was working as a school bus driver at the time of the accident. (R. 529). As a result of the accident, Plaintiff experienced muscle damage. (R. 530).

Dr. Wright performed carpal tunnel surgery on Plaintiff's left hand. (R. 530-531). Plaintiff reported numbness and pain in both arms as of the time of the hearing. (R. 532-533). She has difficulty performing motor skills, such as cutting and writing. (R. 533). Plaintiff relies on the teacher's aides to assist with these functions at work. (R. 533). She has difficulty lifting and holding plates, and her husband has to remove pans from the oven. (R. 533-534). Plaintiff is unable to hold a butcher's knife without losing grip. (R. 534).

Plaintiff experiences pain in both shoulders, and she has difficulty raising her hands. (R. 534). She has tingling and numbness in her fingers and hands. (R. 535). Plaintiff experiences pain in her back, and she cannot sit still for a long period of time. (R. 535). She can sit for "maybe two to three minutes" before she has to "shift or get up or move or stand." (R. 536). Plaintiff can stand for only ten to fifteen minutes because she experiences pain in or hips or spasms in her back from the fibromyalgia. (R. 536). She can walk for approximately twenty minutes before she feels pain, numbness in her arms, spasms in her back, and heavy legs. (R. 537). Plaintiff has an os peroneum in her foot, and her podiatrist has recommended surgery to remove it. (R. 537).

Plaintiff also experiences depression, and she has episodes of crying and sitting in dark places "about once every two weeks when it's to the extreme." (R. 538). When her depression is really bad, Plaintiff leaves work and goes home to bed. (R. 539). Plaintiff testified that her

depression usually lasts for three to four days at a time. (R. 539).

Plaintiff applied for vocational retraining, and she was asked to work for four to five hours at a time. (R. 540). She believes that she could not work a full-time job because she "is barely doing it with the part-time" schedule. (R. 540-541).

Plaintiff experiences pain her in hips and knees when walking up and down stairs, so she tries to use elevators. (R. 542). If there are no elevators, she "stay[s] close to the walls, because [she has] fallen down steps . . . because of [her] knees." (R. 542). She reported that she has mild arthritis in her knees, but her pain is caused by the fibromyalgia. (R. 542).

Plaintiff weighs approximately 220 pounds, and she is five feet and five inches tall. (R. 543). She recently lost twenty pounds, and she plans to continue to lose weight. (R. 542). Plaintiff has difficulty eating when dealing with pain and stress, and she experiences nausea and diarrhea. (R. 543). Plaintiff reports that she gets sick when she eats as a result of the fibromyalgia. (R. 543).

The ALJ then heard testimony from Richard Hickey, a certified rehabilitation counselor with R&B Consulting. (R. 545). Mr. Hickey reported that, based on his vocational expertise and his review of the vocational materials, he had written an opinion regarding Plaintiff's past relevant work. (R. 546).

The ALJ posed the following hypothetical to Mr. Hickey:

[A]n individual of the Claimant's age, education and past work experience. This is based largely on Exhibit 16F, physical RFC that was filled out on 12/9/05 found in the file. Assume the individual would require work which is low stress, simple, unskilled, one, two or three-step instruction, so could only lift, carry 10 pounds frequently, 20 pounds occasionally, stand six, sit six, should avoid frequent ascending and descending stairs, can't perform activities requiring bilateral manual dexterity.

. . .

>Should avoid frequent overhead reaching, should avoid hazards in the workplace, as far as postural activities, no climbing, occasional balancing, stooping, crouching, kneeling and crawling, should avoid pushing and pulling motions with her lower, can perform pushing and pulling motions with the upper, has psychologically based symptoms which affects her ability to concentrate upon complex detailed tasks but would remain capable of understanding, remembering and carrying out simple instructions.  Do you have an opinion whether such an individual with that given profile could perform any of the Claimant's past work?

(R. 549).  Mr. Hickey testified that the ALJ's hypothetical individual could not perform

Plaintiff's past relevant work, but that there are unskilled jobs which this individual could

perform.  (R. 549-550).  Mr. Hickey explained that the hypothetical individual could work as a

switchboard operator, callout operator, or appointment clerk.  (R. 550).  He further testified that

these occupations exist in significant numbers both in the state of Florida and the national

economy.  (R. 550).  The ALJ then asked Mr. Hickey to assume that the hypothetical individual

had the further limitation of avoiding frequent manipulation and frequent pushing and pulling

with her upper extremities.  (R. 551).  Mr. Hickey stated that this additional limitation would not

change his answer to the initial hypothetical.  (R. 551).  Next, the ALJ asked Mr. Hickey to

assume that the same hypothetical individual required a "sit/stand option."  (R. 551).  Mr.

Hickey stated that any of the identified positions could be performed while sitting or standing,

and he noted that the lifting requirements usually do not exceed ten pounds.  (R. 551).  The ALJ

then asked Mr. Hickey to assume that the same hypothetical individual can sit for no more than

three hours and "stand and/or walk" for no more than three hours in an eight hour day.  (R. 551-

552).  Mr. Hickey explained that this limitation would preclude the hypothetical individual from

performing the identified occupations, which involve eight hour workdays.  (R. 552).

## G.     DISCUSSION

### 1. The ALJ's determination regarding Plaintiff's severe impairments

At step two, an impairment or combination of impairments is not severe if it does not

significantly limit the physical or mental ability to do basic work activities.  20 C.F.R. §§

404.1521(a) and 416.921(a).  The Eleventh Circuit and other circuit courts have held that the

second step of the sequential analysis may do no more than screen out de minimis claims.

Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir. 1987); see also Anthony v. Sullivan, 954 F.2d

289, 294-95 (5th Cir. 1992); Bailey v. Sullivan, 885 F.2d 52, 56-57 (3rd Cir. 1989).  In

discussing the severity requirement under the Act, the Eleventh Circuit stated that:

> Step two is a threshold inquiry. It allows only claims based on the most trivial
> impairments to be rejected.  The claimant's burden at step two is mild.  An
> impairment is not severe only if the abnormality is so slight and its effect so
> minimal that it would clearly not be expected to interfere with the individual's
> ability to work, irrespective of age, education or work experience.  Claimant need
> show only that her impairment is not so slight and its effect is not so minimal.

McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).

In the instant case, Plaintiff argues that the ALJ erred by failing to find the following

impairments severe: (1) bilateral CTS in addition to de Quervain's tenosynovitis; (2)

fibromyalgia; and (3) depression.  However, as the ALJ found, the record does not support

Plaintiff's contention.

The record indicates that Plaintiff did seek medical treatment for CTS and fibromyalgia,

but the ALJ concluded that the treatment was routine and conservative in nature.  Plaintiff was

prescribed several medications, and the medical reports indicate that these treatments alleviated

her symptoms.  After a physical examination of Plaintiff, Dr. Chodosh, a consultative physician,

reported that "[c]arpal tunnel signs [are] absent." (R. 26). Dr. Chodosh also found that Plaintiff

has normal manual dexterity. During a follow-up visit with Dr. Powell on September 18, 2003,

Plaintiff reported that a cortisone injection had "helped significantly" with the pain in her hands

and forearms. (R. 194). After a carpal tunnel release surgery, Dr. Wright noted that Plaintiff's

"numbness and paresthesias have resolved, and her sensation has improved." (R. 274). With

regard to the diagnosis of fibromyalgia, Dr. West's treatment notes from September 2005

indicate that Plaintiff's condition has improved. (R. 315). Furthermore, Dr. Chodosh, an

examining physician, diagnosed "chronic pain of uncertain etiology" rather than fibromyalgia.

(R. 23). Finally, as the ALJ noted, Plaintiff did not seek medical care between November CTS

or fibromyalgia, was supported by substantial evidence.

      Plaintiff also contends that the ALJ erred in failing to find that her depression constitutes

a severe mental impairment. However, the ALJ properly found that the record lacked "medical

evidence to show the presence of a medically determinable mental impairment." (R. 24). The

ALJ noted that Plaintiff has never received psychiatric or psychological treatment. Plaintiff has

never been prescribed psychotropic medications by a psychiatrist or psychologist, and she is not

currently taking anti-depressant medication. See Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir.

1992) (noting that an absence of treatment indicates that a mental impairment is not severe). Dr.

Chodosh reported that Plaintiff is "fully oriented, with normal speech pattern, appropriate

thought content, and normal talkative affect." (R. 26, 404). Further, Plaintiff did not allege a

mental impairment in her disability report. See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)

(noting that a failure to allege a mental impairment during the application process undermines

the credibility of a mental impairment). Finally, the record does not indicate that Plaintiff

experiences difficulties with activities of daily living, social functioning, concentration and task persistence, and adaptation to work environments. Dr. Chodosh noted that Plaintiff is "generally independent in activities of daily living." (R. 26). Plaintiff testified that she is capable of driving short distances, cooking simple meals, and attending to her own personal hygiene. Plaintiff further testified that she currently works as a part-time preschool teacher. Thus, the ALJ's step two determination regarding Plaintiff's mental impairment was supported by substantial evidence. Additionally, because the ALJ found that Plaintiff did not have a medically determinable mental impairment, he did not need to evaluate Plaintiff's mental functional limitations. See 20 C.F.R. § 404.1520(a); SSR 96-8p (providing that when there is no allegation of a mental limitation, and no information in the record that there is such a limitation, it is assumed that there is no restriction with respect to that functional capacity). Therefore, this Court is satisfied that the ALJ did not err by failing to find that Plaintiff suffers from a severe mental impairment.

This Court is also satisfied that the ALJ did not err in considering Plaintiff's impairments in combination. If a claimant alleges several impairments the ALJ must consider them in combination and determine whether their combined effect renders the claimant disabled. Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002), citing Jones v. Dep't of Health and Human Svcs., 941 F.2d 1529, 1533 (11th Cir. 1991). The ALJ may meet this standard by specifically noting a claimant's impairments but finding her not to suffer "an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4." Jones, 941 F.2d at 1533; Wheeler v. Heckler, 784 F.2d 1073, 1076 (11th Cir. 1986) (finding the standard met where the ALJ finds the claimant is not suffering from impairment or

combination of impairments sufficiently severe to prevent participation in substantial gainful activity).

In the instant case, the ALJ found that Plaintiff had the severe impairments of hypertension, well controlled; hypercholesterolemia; eustachian tube dysfunction; chronic pain; chronic abdominal and gastrointestinal problems; and obesity. The ALJ considered Plaintiff's complaints of fibromyalgia and CTS, but he found that these symptoms did not constitute severe impairments. Additionally, the ALJ found no medical evidence to support a mental impairment. The ALJ stated that "the medical evidence do[es] not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (R. 20). This statement is sufficient to establish that the ALJ properly considered Plaintiff's impairments in combination.

2. Credibility finding

The ALJ has "wide latitude" in evaluating the weight of evidence, particularly the credibility of witnesses. Owens v. Heckler, 748 F.2d 1511, 1514 (11th Cir. 1984). An ALJ may properly find subjective complaints not credible so long as he articulates reasons that are supported by the record. Jones, 941 F.2d at 1532. A clearly articulated credibility finding with substantial supporting evidence in the record should not be disturbed by a reviewing court. Foote, 67 F.3d at 1562; MacGregor, 786 F.2d at 1054; Sellers v. Barnhart, 246 F.Supp.2d 1201, 1213 (M.D. Ala. 2002).

Here, the ALJ properly articulated reasons for finding Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms not entirely credible." (R. 24). The ALJ based his decision on Plaintiff's testimony and the objective medical evidence in the

record.  The ALJ considered Plaintiff's underlying medical conditions as well as the accompanying objective medical evidence, and he concluded that the medical evidence did not confirm the severity of the alleged pain.  The ALJ further noted that Plaintiff's testimony regarding her lifestyle included activities, such as cooking simple meals, teaching preschool classes, and driving short distances, that were inconsistent with Plaintiff's allegations of incapacitating limitations.  Additionally, as the ALJ noted, the record indicates that Plaintiff's allegedly disabling impairments were at "approximately the same level of severity prior to the alleged disability-onset date."  (R. 24).  Because the objective medical evidence and Plaintiff's testimony indicate a level of daily activity which is inconsistent with Plaintiff's complaints of disabling symptoms and limitations, the ALJ properly found that Plaintiff's claims regarding intensity, persistence, and limiting effects lacked credibility.

3. Dr. Long's opinion

Plaintiff argues that the ALJ failed to comply with SSR 96-6P by not treating the opinion of Dr. Long, a state agency non-examining consultant, as the expert opinion of a non-examining source.  Contrary to Plaintiff's contention, the ALJ "considered and accord[ed] considerable weight to the opinions of the State Agency medical consultants," including Dr. Long.  (R. 26).  Dr. Long reported that Plaintiff had the exertional limitations of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday.  Dr. Long also noted that Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards.  The ALJ set forth these exertional limitations in his decision.  Additionally, the ALJ determined that Plaintiff should be restricted to a work environment with "stable temperatures" and a lack of

workplace hazards.  (R. 21).

In Social Security disability benefits cases, the opinions of examining physicians are generally given more weight than non-examining physicians, the opinions of treating physicians are given more weight than non-treating physicians, and the opinions of specialists (on issues within their areas of expertise) are given more weight than non-specialists.  See 20 C.F.R. § 404.1527(d)(1)-(2), (5).  The opinion of a non-examining physician *alone* does not constitute substantial evidence to support the ALJ's decision.  Swindle v. Sullivan, 914 F.2d 222 (11th Cir. 1990).  In the present case, Dr. Long, a non-examining physician, reported that Plaintiff's primary diagnosis was fibromyalgia.  However, the ALJ, relying on the opinion of Dr. Chodosh, found that Plaintiff had the severe impairment of chronic pain.  Unlike Dr. Long, Dr. Chodosh examined Plaintiff and he provided detailed conclusions for his diagnosis.  Thus, the ALJ's reliance on Dr. Chodosh's diagnosis rather than the diagnosis of Dr. Long was proper.  Because the ALJ considered the opinions of both Dr. Long and Dr. Chodosh, and properly gave greater weight to the opinion of the examining physician (Dr. Chodosh), any suggestion by Plaintiff that the ALJ erred in this regard is without merit.

Accordingly, it is

**ORDERED AND ADJUDGED:**

That the decision of the Commissioner denying benefits is AFFIRMED.

**DONE AND ORDERED** this  *16th*  day of August, 2010.

*s/Maurice M. Paul*

Maurice M. Paul, Senior District Judge